Good morning, your honors, and may it please the court. Peter Apariciabi on behalf of the petitioner. Your honors, there are three core issues that we submit require reversal. The first two are related, and those are the agency's conclusion, the BIA and the immigration judge's conclusion, that this was really a case of general random violence unrelated to any kind of social group. Related to that is the due process violation that's outlined in our briefs in terms of what happened before the immigration judge, and remarkably, as it continued before the Board of Immigration Appeals. And the third issue that I'd like to address is distinct from those two, and that's the issue of the cap claim and how the shadow really capped by Diaz-Reynoso, a recent opinion of this court, fundamentally requires reversal on that alone. So turning to the first issue, the agency here, AIR, the BIA, compounded the same error made by the immigration judge when it concluded that this was a case of general random violence, and it's cited to a couple of cases, and both of those cases are genuinely random violence cases. Someone's property was stolen, and they came here and said, I want asylum. Someone stole my property. And the court's properly said, there's no nexus between a social group and that. The problem is that case law is completely inapposite, and by engrafting and embracing that principle, the immigration judge lost sight of the fact that the pro se petitioner, who only had three years of education and spoke Spanish, actually articulated a whole host of facts that sound in a variety of different social groups. And that wasn't just her oral testimony, Your Honors. That actually was in the I-589 that made very clear that she suffered threats to her and her children because she was seeking redress publicly, investigation and prosecution by the police and the prosecutors for the murder of her daughter. And that was in the I-589. The same testimony existed at trial. Those are facts. Counsel, let me ask you about that. So what is the protected group that the IJ should have found based on that? I understand the tragic circumstance, and that was related to family. But aside from that, what should the IJ have found was the protected group? Yes, Your Honor. There are a few social groups that were advanced from her testimony that the IJ should have illuminated more facts upon in this record, and those are as follows. Number one, people who publicly report crime and seek to have it investigated and prosecuted and as a result are persecuted. And that may or may not be a family based relationship. It can. I mean, if you look at Enrique Rivas and Karek Bok, a case from this circuit, it doesn't have to be a family relationship. It can just be publicly investigating and testifying and reporting crime, taking concrete steps to oppose crime. That's one social group that Ms. Cabrera fit within. The other one is family, that her daughter was murdered. She sought investigative efforts to prosecute and find the perpetrators of the murder. And she and her children were threatened and persecuted for it. And family is under the Rio's basic quintessential social group in the circuit. But there's also another social group here that was missed by the IJ. And it's it's it distills from both of those for her specifically. And that is this is a case of a woman in a country where the country condition reports show femicide is pervasive. And so this is a situation of a woman reporting man on female murder and seeking redress for it. And so there's a gender mooring and footing to the social group here. And that has found refuge in this court's case law. There's the Perdomo case. There's the Mohammed case dealing with female genital mutilation. And gender can be and has been cognized as a social group by this court. And so all of those social groups are at play, given the factual testimony that she was offering and the error from the immigration judge was saying. The factual testimony counsel was that she didn't know who murdered her daughter, male on female murder. But I didn't remember seeing that in any of the briefing or the record as far as like any evidence that this was male on female. I mean, maybe we could speculate about that, but I don't know. But what is what evidence is some male on female motivated? The only evidence we have would be circumstantial, that she lives in a country where rampant violence against women is common. They don't have proper outlets to get redress. And her daughter, who was five months pregnant, was murdered. And so I think it's implied from the record. But, Your Honor, you can embrace the idea that, fine, we don't know. It's still a case of a woman reporting violence on women and not being able to get investigative action. And the other question I've got is I understand it resonates with all of us. The mother and daughter was murdered and calling up on it, trying to get the police to do something and pushing. And that might all make sense. But it's still not clear to me how that somehow how that how there's actually a nexus to either that she's a woman doing this or that it's her daughter. So the family because let's say my friend who wasn't a family member and I'm a male and the friend is a male gets murdered and I'm really pushing to get that murder investigated because it's a friend. Right. You could end up with exactly the same circumstances as here. Whoever whoever didn't like the fact that she was pushing to have this investigated wants her to stop investigating. Not because she's a woman, not necessarily because she's the mother of this woman. Those are the reasons she's doing what she's doing. But just because they don't want to get caught. And so I don't I I'm having trouble making that nexus that that link between your proposed social groups and what's going on here, because I think it could have this could be sure to easily be not motivated by gender or by the relation to the family relationship just by the fact that she's trying to get to have somebody investigate. Yes, your honor. And that would be a social group, too. And that's the Enrique Rivas case, the correct box case. If it were a case that it was a guy reporting the murder of a friend and seeking to have it investigated by the police and the prosecutors and nothing was being done. And the moment that guy reported the violence against his friend, he started receiving death threats because of what he was doing. That would be a proposed social group, too. So that's the point. There were multiple potential social groups at play here. And one of the root errors by the immigration judge was just simply saying, oh, it's just random violence. And this is a legal. Let me ask you, Mr. Council, what what was the IJ's obligation to say? OK, looks like it could be this this particular social group. Looks like it could be this particular social group. Looks like it could be this particular social group because you've already mentioned three. What is his obligation to say? OK, I've heard this testimony. I've heard the story and everything. And here's how I think it fits. What is what is he supposed to do? He is supposed to, within the rubric of due process, develop a factual record once he hears testimony that can fit within a social group and to advise the petitioner of the legal issues and her burdens. And so upon hearing that, the IJ's obligation was to say, OK, you may be talking about something may be random. Maybe it's not. It could be a bunch of things. He had to illuminate the factual record, not by asking pointed questions. I think this question is here because this is so is your argument that if there is, if on appeal we determine or the BIA even determines that there could be a a social group that works right? If we can come up with one with the aid of counsel, if she can present one on appeal, either the BIA or to us. As long as she was pro se and and indigent, if the if the IJ did not come up with that social group, but you know, we don't know why the IJ might not have the IJ. She didn't present it to the IJ, obviously, but the IJ doesn't come up with it, then that's always reversible. That's always error that we should that the BIA should send it back and we should send it back if the BIA doesn't send it back. Yes, if and this is the if your honor, yes, if the testimony illuminated by the pro se petitioner spoke to a social group, the answer would be no. If the person was wrong, yes, but the problem with that is that how does that not make the IJ putting a lot of putting a lot of the burden on the IJ and not on the first? And what we've acknowledged is an adversarial proceeding. And you're basically IJ into the petitioner's lawyer for at least this purpose or the petitioner's advocate. Your honor, I disagree with your premise for this reason. Due process demands that when a pro se immigrant is in immigration court, the IJ actually isn't there to be just the judge who gets to call balls and strikes and just let the person do whatever they want. The case law has made clear as a matter of due process, the IJ in this adversarial system wears a different hat now, and that hat is to aid the petitioner to gather the facts to figure out if this amounts to something. And what happened here is the IJ tripped those wires, not developing the factual record, not advising of the exact legal issues, using the country condition report to dismiss her claim when the report was written in English and she never could have even read it. Those are the hallmarks of due process. And that's why the IJ had that burden. That is the obligation the law puts on the IJ under all the case law we've cited, akin to a guy in the Kizma case. The IJ must do that. And here, the root problem in terms of the due process violation before the IJ was that it didn't get that there was a social group. It didn't even recognize that there could have been a mixed motive. And this court's case law is crystal clear. Even in mixed motive cases, if it's a motive, that can be enough to sustain relief. That wasn't addressed. And so the due process violation, I would allude to, actually extended in a way that's very significant we submit. And that is before the BIA, she finally got a lawyer. And that lawyer went to the BIA and said, I don't have the record. I need more time. And the BIA said, too bad. And what ultimately happened then is the lawyer before the agency on appeal had some dailies, but didn't have some critical record evidence that's in the record. The I-589, which articulated a social group in terms of facts that could constitute a social group. And she also didn't have the country condition reports having been translated into English. And so that would've been another argument she could have made. And I would submit to this court. I mean, this court has thousands of immigration cases every year, as you know. And in every single one of them, no one is required to file an opening brief until the administrative record is filed. I would submit if we were forced to file an opening brief before we got the record, this court would, if the appellate commissioner issued the order, a panel would overrule it. The court would never do it. I mean, it's just outside the bounds of any legitimate exercise of discretion to deny counsel record of materials to make and brief an appeal for a pro se woman who's had three years of education. And so I think the due process violation illuminates why the proposed social group existed and why it needs to be sent back to ascertain this. The third error, I'll turn to briefly, is the cat claim. And the cat claim was, is really handled by this case, this court's recent Diaz-Reynoso case. Diaz-Reynoso makes crystal clear that if the BIA just says, you know, you know, we've looked at all the evidence in the record, you lose. That's not enough. There is a particularized analysis that's required to identify and track the evidence. And here, the language of the BIA here is almost identical to the language in Diaz-Reynoso that this court rejected and said it's not enough. And so the BIA just had that blank language, it's not enough. And it engrafts onto the IJ and the IJ's decision, which made errors. The IJ actually made a legal error in failing to consider all the evidence himself. So we can't just assume that the IJ did it all. And so the BIA just rubber stamped it. The IJ got stuff wrong. He said you didn't report when she had reported multiple of these events and threats to her, to the police and the prosecutors on multiple occasions, even if she didn't report the very, very last assault on her. The IJ also ignored the facts that these death threats were unabated. And that's a very relevant fact for CAT. And so Diaz-Reynoso mandates that the CAT claim be reversed. I think the shadow cast by that case is crystal clear for here. And since this case has to go back on CAT, we would submit this woman needs her day in court. All we want is a full and fair hearing. And this is sort of within the rubric of due process. The U.S. Supreme Court in the seminal case of Bridges versus Wixon involving the labor leader, Harry Bridges, said meticulous care. That's a quote. Meticulous care is required before we deport someone in an unwarranted fashion because it triggers constitutional life and liberty questions. Counsel, let me ask you, she had five hearings, if I read the record correctly, and multiple continuances so that she could either get counsel or gather other information from her home country. And so why isn't that enough to get her day in court? And secondly, exactly what would have been presented to the BIA that couldn't be presented? Because it looked like counsel had the full transcripts. Your client had the information she filed. What what would have been done differently? What would have been done differently is counsel would have had the I-589, which was an exhibit admitted at trial, but it wasn't in the daily trial transcripts. The I-589, if you go look at it at page 187, actually articulates a social group. She also would have had the actual. What social group? What social group does it articulate? It articulates that she was persecuted and threatened because she was investigating the murder of her daughter. And that is enough to put you in the ballpark of an articulated social group. So the BIA would have been told there is something that was given the IJ. So, counsel, but he did have the transcripts of the hearing. And I can't I haven't gone back to these transcripts, but I can't imagine that that didn't come up at the transcripts that she was persecuted for investigating the murder of her daughter. I mean, I think how could counsel not have known that? Yeah, I mean, it's in the BIA decision. Yes, but it was in the I-589 and she didn't have the I-589. It's a basic it's an exhibit admitted at trial. And the appellate lawyer wasn't allowed to have the exhibit admitted at trial to look at it and work with it on appeal. Same with the country condition reports. Counsel, what I'm asking is, like, I think I think the question would be, well, what would he have? And I guess I'm asking, what would he have had that he didn't already have given what that he already had? And so you have from the testimony and from his client, it doesn't it doesn't pass a straight face test for me to say that, well, he you couldn't have known that that she had a claim based on the fact that that she was being persecuted for investigating the murder of her of her daughter. That seems to be the central thing that's in everything. How could he not known that just because he didn't have the one form? Everything else would have told him that, too. What the evidence would have shown is that she had made that articulation from day one. And the appellate lawyer would have been able to argue that this has been in the record from before this IJ ever picked up this case. The appellate lawyer also would have been able to articulate that. Wait a second, that exhibit that you admitted into evidence and used against her. It was never translated. So how could she have mined it for useful information on other legal issues that are germane, like relocation and the like? And with respect to your specific question about the multiple hearings that predated this, she was detained. She didn't have a lawyer. She was unable to gather evidence. And for the trial lawyer, the difference would be monumental. The trial lawyer would have asked narrative questions, the classic stuff we do on direct to illuminate the testimony about gender and gender violence, about violence and the repercussions to her. They wouldn't have been narrow, closed questions such that by the time the IJ here was done, the government didn't even ask a question. That was how effective the IJ cross-examination was. Counsel, who identified the family as a particular social group? I think the I will be the error is the IJ didn't identify that family could be a social group and the IJ. But the BIA, the BIA, the BIA's decision treats it as a social as a particular social group that that they addressed. Yet what they said is, although there's a reference to family, there's nothing here that has anything to do with her being persecuted because of family. But that has zero factual evidence. I mean, to the extent they were caught. Let me ask you this. I don't recall offhand because I didn't have a chance to reread the IJ's decision. But did he identify any particular social groups? The IJ, elliptically, the IJ did in the sense of the IJ said this is just random violence unrelated to family. But the problem is all of the testimony was about her investigating the murder of her family. And so the conclusion that there was no factual evidence of family has we even within substantial evidence review, it has no mooring at all in the factual record. OK. All right. Thank you, counsel. Well, I'll give you a chance for some rebuttal. Thank you. After we hear from after we hear from the government. Thank you. Good morning, Your Honor. My name is Jeff Ewert. I'm here on behalf of the attorney general from the Department of Justice. This court should deny the petition for review because under the substantial evidence standard, the board was correct in its conclusion that Ms. Cabrera has not established past persecution or a fear of future persecution if she were to return to Guatemala. My opposing counsel talks a lot about due process, but I think that he misunderstands that concept. Ms. Cabrera was provided a full and fair hearing. Judge Emigut, you're absolutely correct. There were four hearings at each one of those hearings and at each notice that Ms. Cabrera received, she was told about the ability of counsel to represent her. She was told that there were free lawyers available who were there to assist her. And the judge, the immigration judge, actually does walk through the law. The immigration judge walks through the claims. The immigration judge, in fact, identified a family group as a potential protected group. And in the immigration judge's decision, says even assuming that she's a member of this group, that she didn't establish this nexus. And under the board's review of the immigration judge's decision, it looked at evidence. And as to this allegation that somehow the lawyer that did represent her before the board was missing information, that lawyer was able to use the information that he had, the transcripts of Judge Van Dyke, as well as the information that Ms. Cabrera already had to raise arguments that she didn't even raise before the immigration judge. And so when the board looked at the record and said, OK, you're now raising arguments for the first time in this appeal under this court's precedent. It's well established that she's not allowed to do that. She has to raise those arguments before the immigration judge. And when you look at the record and you look at some of these transcripts of the hearings, starting at AR 103, going through to AR 148, those are the hearings where you can actually see the dialogue between the judge and Ms. Cabrera. And he walks her through the requirements for establishing past persecution. He talks about the things that she alleged in her form. It's like it's a woman. I'm sorry. She asked a whole bunch of questions of her and had her explain all of these different things. And so the immigration judge did everything that she was supposed to do in these circumstances. And under this court's precedent, the immigration judge does not need to create a claim where none exists. There's no such requirement for that. We cite a case, Menendez-Hernandez from 2019 in our answering brief. We also cite a case, I think it's Ardzee versus Holder. It's a 2011 case. It talks about failure to raise an issue and failure to exhaust. Both of those cases speak to the due process allegations that she's been raised here before this court, and there's no reason for this court to address them. As to the notion that the proceeding was somehow fundamentally unfair, I think when you look at this record, what you'll see is you'll see that the immigration judge understood the law, explained the law to the pro se petitioner and explained exactly what she needed to prove. It is her burden. It is her burden under the regulations that explain asylum. And it's also her burden under the regulations that explain withholding for removal and the convention against torture. Here, most of this focus was on past persecution. She alleged that unknown attackers somehow murdered her daughter. She never knew who they were. And then unknown people continue to message her with threats. She reported that to the police, but she was never able to establish a nexus that connected those allegations with the reason for doing it. And it's not enough to say that it was just because it was her daughter. In Guatemala, she also has her husband, she has her sons, and she has two more daughters. Two of her daughters were able to relocate to a different location. There's no evidence in this record to suggest that any other member of her family was targeted or that they suffered from any sorts of criminal activity that she has alleged. And in fact, it goes to the notion of future persecution if she were to be removed. One of the things under the regulation says that you cannot establish future persecution unless you can also say that it would be she'd be unable to move somewhere else. And on this record, she explains that she was able to get her daughters out of her town to go live with their aunts and that nothing has happened to them. There's no evidence in this record to suggest, and the board was right to conclude, that she has not established a fear of future persecution if she were to be removed. Now, she was also attacked in December of 2017. Again, unknown assailants. And if you take her for her word, which the immigration judge did, he said that although she provided evasive answers and although her testimony was not sufficiently detailed, he did credit her testimony. And what she said was, and if you read this, she said that she was attacked by unknown assailants. They told her to leave. They didn't say anything about her daughter. They didn't say anything about her family. And she never put forth any evidence to suggest so. From the time that she started her hearings in April 2018 until the time in which they were finally finished in September of 2018, Ms. Cabrera was given every opportunity possible to collect evidence. She was given the human rights report. The immigration judge discusses that report with her, makes sure that she has a copy of it, and actually stops the hearing and says, come back to me at the next hearing and we'll discuss this. She was asked by the immigration judge, may I rely on this? Do you have any problem with that? She said, no, it's a problem for me to rely on it. And she raised no arguments against use of that report. Also, as to the variety of social groups, we explain this in our brief. For the most part, what Ms. Cabrera's arguments rely on are just different recastings of the same sort of group. You heard counsel talking about people who publicly report crimes and that they're attacked by criminal elements that are unknown, or that there's somehow some sort of family group that the immigration judge missed. And if you read the record, that's simply not the case here. The immigration judge looked at the social group and talked about the criminal elements that allegedly that she talked about attacking her and the messages that she received. And the immigration judge properly considered that as she was required to do over the course of these four hearings. Now, as to the board's decision, the board looked at the same record, it carefully reviewed it, and it concluded that the immigration judge did everything that she was required to do. She complied with the requirements of due process. In this appeal, when you're reviewing the board's decision, it's under the substantial evidence. And the only way that Ms. Cabrera can prevail is if you conclude, this panel concludes, that the evidence compels you to reverse. And she's not been able to come forth with evidence that compels the conclusion that the board got it wrong and that the immigration judge somehow missed something. Evidence in this case does not compel that. And I think if you look at all the other cases that we've cited in our brief and the cases that we relied on, that the board relied on, what you'll see here is that they did everything that they were required to do. Unless you have any further questions. Can you address the CAD claim? As to the CAD claim, Your Honor, torture is very different from persecution. Torture is actually has a legal meaning. It's very severe violence. And the things that she has alleged here, none of it rises to torture, Your Honor. I don't think that there's any allegation here that the police were somehow not able to protect her or unwilling to protect her, or that they somehow had turned a blind eye to the level of violence that would rise to the level of torture. It may well be that the Guatemalan police have a lot on their hands and didn't do a very good job of investigating this case. That does not mean that Ms. Cabrera was tortured or that she would face torture to remove a back to Guatemala, Your Honor. Okay. Counsel, let me ask you, from my reading of the record, Ms. Cabrera did not report the incident that occurred on December of 2017. Is that accurate? That is accurate, Your Honor. She did not report that incident to the police. And in fact, I think the record about two weeks later, she fled the country. Okay, Mr. Counsel, Mr. Frischidi, you have a minute to make whatever point you want to make. You bet. Thank you, Your Honor. With respect to the IJ's decision, the IJ at page 87 of the record noted that assuming she was persecuted because of her daughter, he says it doesn't appear it was sent or received based on that relationship. So there was some understanding of family. But here's where the error was. As I've argued already, Enrique Rivas says beyond family, you can have a social group based on the reporting of crime. And that's what the IJ didn't address at all. And this failing to address issues comes up perfectly with respect to the relocation issue. The IJ never asked her, is she scared to go back? Could she go to a different city? All the types of open-ended questions you would get on the relocation issue. All that happened is she happened to mention that she had moved two of her daughters out. And the IJ then said, oh, you see, you can relocate. But she was never asked about it. And that's the IJ's duty and the IJ's burden, Your Honor. Finally, I would note this. I'm not sure if counsel said that the threats that she reported had no nexus and whatnot to her investigative efforts. That's not correct. The threats that she's, that when she reported to the police and prosecutors of the crime and then reported that she was getting text messages and being threatened, she was being threatened because she was an investigator. The final one on the street assault, it's correct that there wasn't a nexus, but she was assaulted on the street and told to leave the country, which does not have any relevance to general crime. That actually has, it continues the pattern of practice of what the text messages were, which were stop investigating. Okay. I don't think so. Thank you, counsel. Both of you. Thank you very much. We appreciate your arguments this morning. The case is submitted at this time. And that ends our session for today. Thank you, Your Honor.
judges: Paez, Immergut, Vandyke